UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

ROSEANNE ZITO,

                Plaintiff,                09 Civ. 9662

   -against-                        OPINION

FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON, LLP,

                Defendant.

------------------------------------X

A P P E A R A N C E S:

        Attorney for Plaintiff

        DELINCE LAW PLLC
        44 Wall Street, 10th Floor
        New York, NY  10005
        By:  J. Patrick DeLince, Esq.

        Attorneys for Defendant

        PROSKAUER ROSE LLP
        Eleven Times Square
        New York, NY  10036-8299
        By:  Bettina B. Plevan, Esq.
            Marc A. Mandelman, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/19/12

**Sweet, D.J.**

Defendant Fried, Frank, Harris, Shriver and Jacobson, LLP ("Fried Frank" or the "Defendant") has moved pursuant to Rule 56(b) of the Federal Rules of Civil Procedure for summary judgment dismissing the first amended complaint (the "Complaint") of the plaintiff Roseanne Zito ("Zito" or the "Plaintiff") alleging claims for age, gender and disability discrimination and retaliation.  Upon the facts and conclusions set forth below, the motion is granted, and the Complaint is dismissed.

## I. **Prior Proceedings**

Zito filed her initial complaint on October 22, 2009 and her Complaint on March 1, 2010 alleging unlawful discrimination and disparate treatment against her based on age, gender and disability, in addition to retaliation therefrom, in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. (the "ADEA"), the Americans with Disabilities Act of 1990, as codified and amended at 42 U.S.C.

1

§§ 12112-12117 (the "ADA"), and the New York State and City
Human Rights Law ("NYSHRL" and "NYCHRL") arising out of her
termination as Evening Secretarial Supervisor by Fried Frank on
August 18, 2008.

Discovery proceeded and the instant motion was heard
and marked fully submitted on February 1, 2012.

## II.  **The Facts**

The facts were set forth in the Defendant's Statement
and attached exhibits, pursuant to Local Rule 56.1, and the
Plaintiff's Counter Statement of Disputed Facts and attached
exhibits, pursuant to Rule 56 of the Federal Rules of Civil
Procedure and Local Rule 51(b), and are not in dispute except as
noted below.

Zito's Employment at Fried Frank

Zito was born on September 24, 1951.  On March 23,
1981, she was hired by Fried Frank, a large international law
firm with approximately 550 attorneys worldwide.  Zito began her

2

employment as a secretary on the day shift and in 1994, she requested and received a transfer to the night shift.

In September 1998, Zito was promoted to Evening Secretarial Supervisor, the position she maintained until her discharge in 2008.  The Secretarial Services department had 7 supervisors who covered various shifts.  The evening shift had two supervisors, Zito and Maria Rosario ("Rosario"), the Evening Word Processing Supervisor.  During her tenure, Zito reported to Kathy Alcott ("Alcott"), the Director of Secretarial Services, who was born on July 3, 1954, and Liz Hudson ("Hudson"), the Manager of the second evening shift.

Zito's primary responsibility as the Evening Secretarial Supervisor was assigning and coordinating evening secretarial assignments.  Her other responsibilities included processing document requests, making conference room reservations, responding to any security issues and providing assistance to Fried Frank's midtown conference center.  At her request, Zito was also given permission to complete written performance evaluations for those employees who she supervised.

3

When Zito first became the Evening Secretarial
Supervisor in 1998, she was responsible for coordinating
staffing for 30 to 40 attorney requests for evening secretarial
staffing each night.  Over the years, attorney work habits
changed, and attorneys became more computer literate.  By
October 2005, the number of evening secretarial desk assignments
requested by attorneys at night was two to three assignments per
night.

According to Fried Frank, little work needed to be
done to assign and supervise the evening secretarial staff.
This contention is denied by Zito, who argues that other
secretarial and mini-center assignments required permanent
assignments that were unaffected by attorney computer habits.
According to Zito, she maintained the responsibility for
staffing approximately seven to ten assignments per evening for
these assignments.  In addition, as the Evening Secretarial
Supervisor, Zito supervised approximately 19 individuals (13
were permanent and six were hourly employees).  Despite the
decline in the individual attorney assignments, Zito maintains
that she supervised the busiest shift.

In October 2005, amidst rumors that Hudson may retire soon, Zito sent Alcott an email memo expressing her concern over her future role at the firm and her work assignments.  Zito wrote that, "[m]y role has changed over the past few years.  I no longer supervise the staff I once did and the desk assignments have now dwindled down from 35-40 to 2-3.  In the process I have lost much of my wordprocessing skills."  She also noted that "the role of secretarial services has shifted from editing documents to trouble shooting corruption in documents.  This requires a specialized skill that I do not possess."  Zito admitted "feeling a sense of insecurity" and suggested that she "either assume more administrative responsibilities or reinforce my secretarial skills."

Zito's Disability Resulting From Alcoholism

Zito is a recovering alcoholic and has been sober since May 1993, when she was working as a secretary during the day shift.

On May 26, 1993, Zito went to lunch at noon and, without authorization, failed to return to work that day.  At

5

approximately 2:15 p.m., a unidentified man called Fried Frank personnel stating that he was taking Zito to Bayridge Hospital.

The next day, Zito called the message desk and left a message stating that she would not be in.  At approximately 10 a.m., Zito called and spoke with Alcott, stating that she had no recollection of what happened the prior day.  Zito explained that she went to lunch with a man she had met the previous week, and he was supposed to drive her back to work after their meal but did not.  Alcott asked several times where the man took her, but Zito responded each time, "I don't know" and that she felt powerless.  Zito stated that the man finally took her back home in the evening, but had no recollection of where he had taken her during the day.  Alcott recalls that Zito began crying at this point and said, "I have an alcohol problem."

Zito testified that on May 28, 1993, upon returning from work, she met with Alcott and Gwen Robinson ("Robinson"), Fried Frank's Human Resources Manager.  Zito was not disciplined for failure to return to work, but was told that her job was at stake if her behavior continued.  As per firm's policy, Fried Frank supported Zito in her recovery and referred her to the Employee Assistance Program.

6

Zito testified that she attended a rehabilitation program for four weeks.  By affidavit in opposition, Zito stated that she attended biweekly meetings and continued Alcoholic Anonymous attendance for a year.  After the incident in May 1993, there were no further incidents at work relating to Zito's alcoholism.

Zito Takes a Leave of Absence

On April 28, 2008, Zito broke a toe on her right foot and took a leave of absence pursuant to the Family and Medical Leave Act (the "FMLA") from April 28, 2008 through June 2, 2008 due to her toe injury.

During her five week leave of absence, Zito claims to have received two telephone calls from Alcott.  Zito testified that Alcott first called her approximately two weeks after her leave of absence began to inquire how she was feeling.  Zito advised Alcott that she had broken her toe when she slipped on water spilled on new tiles in her basement.  Zito testified that she received a second call from Alcott, in which Alcott advised her that her salary continuation payments may be affected while

she was on a leave of absence because Zito had not returned the
disability paperwork from her doctor.  By affidavit, Zito stated
that Alcott told her she would not be receiving salary
continuation payments.

During her leave of absence, Zito was also in email
contact and telephone contact with Toni Frobuccino
("Frobuccino"), Fried Frank's Benefits Manager.  Frobuccino
explained to Zito, the firm's policies and procedures for taking
a leave of absence.  At Fried Frank, salary continuation
benefits during a leave of absence are dependent upon, among
other things, receipt of approximate disability documentation
and review and approval by the firm's insurance carrier.  Fried
Frank's FMLA policy also requires that employees return
certification forms for a leave of absence within 15 days.
Frobuccino advised Zito that the timely return of the disability
forms was required to allow Fried Frank's insurance carrier time
to review the forms prior to the continuation of salary
benefits.

Zito testified that she did not return the required
forms within 15 days.  By affidavit in opposition, Zito stated
that the delay resulted because Fried Frank had given her doctor

an incorrect fax number.  As of May 21, 2008, Zito had not

returned the required disability forms although she had provided

emergency room records and contact numbers for her physician.

Zito testified that she received her salary continuation

benefits after she returned to work.

Frobuccino left Zito voicemail messages about

returning the required forms.  By affidavit in opposition, Zito

stated that Frobuccino relayed that the deadline was May 2,

2008, but that she did not receive the documentation until May

23, 2008 when it was sent by Federal Express.

While Zito was on a leave of absence, Rosario, the

Evening Word Processing Supervisor, was also on a leave of

absence.  According to Fried Frank, Rosario took a medical leave

of absence pursuant to the FMLA from March 2008 until June 2008.

According to Zito, she was on worker's compensation leave.

During Zito's and Rosario's leaves of absence, there

was no supervisor on duty during the evening shift, although

Hudson was the manager on duty.  By affidavit in opposition,

Zito has stated that Hudson assumed Zito's and Rosario's

supervisory duties of during their respective leaves.

9

Zito Returns from Her Leave of Absence

Zito testified that when she returned from her leave of absence, her job title, job duties and salary remained the same.  However, Zito stated that Alcott advised her that her responsibilities should be shared with Devi Kawalek ("Kawalek"), an employee Zito had supervised.  In 2008, Kawalek was 54 years old and had been employed with Fried Frank for over 30 years.

Zito testified that while she was on the leave of absence, Kawalek had "stepped up to the plate and helped out the department."  By affidavit in opposition, she stated that Kawalek, who had previously only answered phones and word processed documents, had not been properly trained to perform Zito's duties.

Zito complained to Human Resources that she believed that her job duties were "modified" upon her return from her leave of absence and she requested an "updated/written job description."  Zito was provided with a job description and advised that her job duties had not changed.  By affidavit in opposition, Zito stated she was advised by Gayle George

("George"), Director of Human Resources Managing Partner, that her responsibilities would be shared with others.

Approximately one month after Zito's return, in July 2008, Zito and Kawalek engaged in a dispute concerning Kawalek's answering the telephone outside of the designated front desk area.  Zito believed Kawalek was acting insubordinate and provoking her to be unprofessional.  In a subsequent meeting with Kawalek, Hudson and Zito, Kawalek made allegations that Zito was abusing her authority and stated that Zito was a horrible person who was "drunk with power."

Within a few weeks of Kawalek's comment, during a yearly performance evaluation meeting, Sylvia Paroline ("Paroline") commented, "I feel like I'm at an AA meeting." Zito contends that the two comments referenced her recovering alcoholism and was made intentionally as a malicious characterization to hurt and humiliate her.

According to Fried Frank, over the years as the Evening Secretarial Supervisor, Zito engaged in a series of conflicts with a number of employees under her supervision. According to Zito, there were a few employees who were

11

insubordinate or unable to accept criticism, but that there were no conflicts with the remaining supervisees.

## Fried Frank Implements Personnel Changes and Reductions-in-Force, Terminating Zito

In 2005, in a meeting with managers of the secretarial unit, Alcott stated that she had spared her department from outsourcing for at least two years.  By 2006, Fried Frank began a review of its administrative resources and staffing requirements.  The firm began planning for the consolidation of certain departments and the expansion of others.[1]

On or about February 14, 2007, Fried Frank hired five floaters, who were in their twenties, and one floater named Pamela Lobo ("Lobo"), who was approximately 55 years old, to work the secretarial day shift.  At the same time, Fried Frank transferred older female secretaries into the floater secretarial pool.  Although they were technically floater

---

[1] Paula Zirinsky, Director of Media Relations and Communications, commented on August 20, 2008 to "The BLT: The Blog of Legal Times" and other news media that, "Over two years ago Fried Frank began a review of its administrative resources and staffing requirements.  As part of this review process some departments were expanded and others consolidated. Today's administrative staff reductions are part of that business review process.  Those affected are in the Firm's NY and Washington DC offices.  Severance and career counseling were offered to all those affected."

secretaries, a number of the older secretaries previously had
been assigned to permanent positions.

According to Fried Frank's Chairperson Valerie Ford
Jacob ("Jacob"), due to a dramatic downturn in the economy, the
firm's business began to "deteriorate" in 2008.   Its attorney
work hours decreased that year in comparison to prior years.
Whether the decrease was material is disputed.   For the fiscal
year 2008, Fried Frank's gross revenues decreased by
approximately 20 percent.

In May or June of 2008, Alcott testified that she was
called to attend a meeting with Jacob and Justin Spendlove
("Spendlove"), the firm's Managing Partner, in which she was
informed of the economic downturns that were affecting Fried
Frank.   Reductions-in-force ("RIF") were planned over the course
of three conversations between Alcott, Jacob and Spendlove.
George in Human Resources also had an involvement in the
planning of the RIF.   According to Fried Frank, the decision to
implement a RIF was made in August 2008.   According to Zito,
there is an issue of fact as to whether the RIF were solely the
result of economic conditions.

No phone calls, emails, or notes were taken during or in preparation for the first meeting.  After meeting for approximately ten minutes, Alcott was given directive to "reduce administrative staff" in connection with the upcoming RIF.  According to Alcott, she was given the sole responsibility to determine those candidates under her charge who would be laid off.

Prior to the second meeting in June, Alcott determined that the floater secretaries' positions would be eliminated and that other assigned secretarial positions would be consolidated.  Approximately two weeks after the first meeting, Alcott met with Jacob and Spendlove for a second meeting to discuss the RIF and Alcott's proposed plan.  There were no phone calls, emails, or internal notes to document the process by which candidates were to be chosen for the RIF, nor any documentation that any meeting regarding the process had taken place.  The second meeting was short and Alcott was directed to report to, receive counsel from and provide the Human Resources department with her final list.

The sole document that Alcott retained in connection with planning for the RIF contained the names, ages and races of those employees selected for termination.  The one-page document

14

contained the following notation in Alcott's handwriting:   "57

40+ 43 under" and "2.4 over 1.8 under."  Alcott has admitted

that she wrote these notations but stated that she had forgotten

why she had done so.

During the terminations, Alcott made the decision to

eliminate the Evening Secretarial Supervisor position held by

Zito, therefore terminating Zito's employment.  Thus, Zito's

employment was terminated on August 18, 2008 as part of the RIF.

At the time of her discharge, Zito was 57 years old and her base

salary was $74,000 per year.

Forty-three administrative staff positions were also

eliminated at Fried Frank's New York office on August 18, 2008,

including nineteen positions from the Secretarial Services

department.  According to Zito, an issue of fact exists as to

whether numbers are 42 or 43, and 18 or 19.  Within the

Secretarial Services department, Zito was the oldest and the

only titled secretarial supervisor selected as part of the

reduction in the force.

According to George and Alcott, Zito's termination was

not performance based, but instead, based on the firm's need to

15

eliminate the Evening Secretarial Supervisor position.   Fried

Frank contends that the position was eliminated and has not been

subsequently filled.   According to Zito, although the title was

eliminated, the duties were transferred to another employee.

Zito states that after her termination, her supervisor, Hudson

absorbed her remaining job responsibilities.   Hudson was 65

years old at the time of the RIF and was not discharged.

Hudson retired in April 2009.   After Hudson's

retirement, Alcott and Rosario absorbed Hudson's

responsibilities and Hudson's position has remained unfilled.

According to Zito, Rosario assumed Zito's previous

responsibilities as well as those of Hudson.

Zito and Rosario's supervisor positions were created

approximately ten years prior to the RIF.   According to Fried

Frank, the Evening Word Processing Supervisor position held by

Rosario required more word processing and document skills than

the Evening Secretarial Supervisor position held by Zito.   This

contention is denied by Zito.   In addition, Zito argues that her

termination was discriminatory because Rosario, the Evening Word

Processing Supervisor oversaw fewer employees than Zito and had

not been terminated.

16

At the time of the layoffs, the designated group of floaters was comprised primarily of older, non-white women, of non-U.S. origin.  For example, Kim McEvoy ("McEvoy"), 49, who had been with Fried Frank for 20 years, and who had worked with both Jacob and Spendlove, was assigned to the floater pool.  She was replaced by a 24 year old inexperienced new hire named Lyndsley Idle ("Idle").  Before the layoffs, Jacob had her transferred into a newly created job in the account department. Another example was Janice Rollins ("Rollins"), 56, was assigned to the floater pool and out of her permanent assignment to a partner at the firm.  A younger secretary named Ashleen O'Reilly ("O'Reilly") replaced her before the layoffs.  In addition, a newly created conflicts analyst position was given to PJ Delia ("Delia"), a corporate paralegal who was younger than Zito.

Almost contemporaneously with the layoffs, on August 14, 2008, Fried Frank announced internally that it had promoted five associates to partner, effective September 1, 2008.  Soon thereafter, the firm announced the promotions publicly.  Zito points out that all four of the older regular secretaries who were included in the August 2008 RIF had worked in the corporate

and real estate departments, departments which had experienced

growth and associate to partner promotions.

No male day secretary, night secretary, supervisor or
word processor was terminated during the August 2008 RIF.  At
least four male secretaries who worked primarily in word
processing or desktop publishing appear to have been listed on
the Decisional Unit as supervisors or "secretary."

On October 21, 2008, Zito filed a Charge of
Discrimination with the Equal Employment Opportunity Commission
("EEOC") against Fried Frank.  The notice of charge of
discrimination included alleged discrimination under the ADA
based on disability and retaliation.  The notice made no
reference to age or gender discrimination.  By letter dated July
27, 2009, the EEOC issued a Notice of Right to Sue.

## III. __The Summary Judgment Standard__

Summary judgment is granted only if there is no
genuine issue of material fact and the moving party is entitled
to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548,

18

91 L. Ed. 2d 265 (1986); SCS Commc'ns, Inc. v. Herrick Co., 360
F.3d 329, 338 (2d Cir. 2004). In determining whether a genuine
issue of material fact does exist, a court must resolve all
ambiguities and draw all reasonable inferences against the
moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith
Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d
538 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir.
2002). In addition, courts do not try issues of fact on a
motion for summary judgment, but rather, determine "whether the
evidence presents a sufficient disagreement to require
submission to a jury or whether it is so one-sided that one
party must prevail as a matter of law." Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d
202 (1986).

     The moving party has the initial burden of showing
that there are no material facts in dispute, Adickes v. S.H.
Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142
(1970), and can discharge this burden by demonstrating that
there is an absence of evidence to support the nonmoving party's
case. Celotex, 477 U.S. at 325. The nonmoving party then must
come forward with "specific facts showing that there is a
genuine issue for trial," Fed. R. Civ. P. 56(e), as to every

element "essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[T]he non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quotation omitted).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008). "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Id. (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Id. Neither conclusory assertions, see Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004), nor contentions that the affidavits

20

supporting the motion are not credible, see Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995), create a genuine issue of material fact.

## IV.  Discussion

The Age and Gender Claims Under Title VII and ADEA Are Precluded

The exhaustion of administrative remedies and the obtaining of a right to sue letter from the EEOC are necessary predicates to filing a Title VII or ADEA action.  See 29 U.S.C. § 626(d)(1); 42 U.S.C. § 20003-5(f)(1); Williams v. N.Y. City Hous. Auth., 458 F.3d 67, 69-70 (2d Cir. 2006); Holt v. The Continental Gp., 708 F.2d 87, 89-90 (2d Cir. 1983); Butts v. City of N.Y. Dep't of Hous., Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993).  A plaintiff may assert claims "not raised in an EEOC complaint, however . . . if they are 'reasonably related' to the claim filed with the agency."  Williams, 458 F.3d at 70.

"This Circuit has recognized that '[a] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made."

21

Id. (quoting Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003)).  In making this determination, "[t]he central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." Id. (citation omitted).

Here, as an initial matter, the Plaintiff did not check the boxes for "age" and "gender" on the cover sheet to her EEOC charge of disparate treatment arising out of her perceived disability.  The factual statement filed by the Plaintiff supporting her EEOC charge contains no allegations of discrimination on the basis of age or gender.  In addition, neither the Defendant's Position Statement in response to the EEOC charge or the Plaintiff's rebuttal to the Position Statement contained any mention of age or gender.  The first references to any allegations of age or gender-based discrimination are contained in the Plaintiff's complaint in this action, filed on October 22, 2009.

Plaintiff argues that her factual statement and rebuttal to the Position Statement specifically mentioned her seniority, that her supervisor was surprised to learn her age and perceived her as weak, inferior and not strong enough to

22

withstand bullying tactics.[2]  The Plaintiff contends that these traits are "usually described as female attributes and that fit a female stereotype, [and therefore] suggest that gender was a factor in the 2008 RIF and reasonably would have fallen within the ambit of the anticipated EEOC investigation."  (Pl. Opp. Memo at 10).

        Courts in this circuit have considered and "refused to recognize allegations that lacked factual specificity because the 'EEOC cannot be expected to investigate mere generalizations of misconduct, nor can defendants adequately respond to them.'" Gilani v. National Ass'n of Securities Dealers, Inc., No. 96-8070, 1997 WL 473383, at *4 (S.D.N.Y. Aug. 19, 1997); Chinn v. City Univ. of New York Law School, 963 F. Supp. 218 (E.D.N.Y. 1997) (holding that a "vague, general discharge of discriminatory conduct raised before the EEOC is not sufficient

---

[2] "Specifically, the Plaintiff alleged:

- On July 25, I was called into Ms. Alcott's office, along with Ms. Hudson, to go over my performance review . . . We then talked about the house I was buying and I informed Ms. Alcott that I was in the process of buying this house for my retirement.  She asked me how old I was and seemed surprised to learn that I would be turning 57 in September.

- [M]s. Alcott, . . . perceived me as a person with a disability who was weak, inferior and not strong enough to withstand her bullying tactics.

- Had I not been terminated, in terms of seniority, I would have been the most senior supervisor on staff."

(Pl. Opp. Memo at 10).

to trigger agency investigation of specific instances of discrimination alleged in the complaint.").

In addition, retaliation claims "represent an entirely distinct theory of liability, which cannot be viewed as 'reasonably related' unless they are specifically included in an EEOC charge." Gilani, 1997 WL 473383, at *4 (citation omitted). In her submissions to the EEOC, including a five-page single spaced letter with footnotes, the Plaintiff did not imply any age or gender discrimination claims with factual specificity. Vague references to her seniority, conversations as to her age and perceived weakness in her EEOC Charge does not equate to specific allegations of age or gender discrimination sufficient to trigger agency investigation.  Thus, here, the Plaintiff's age and gender-based claims cannot be considered "reasonably related" to the claims of disability-based discrimination contained in the EEOC charge. See Carter v. New Venture Gear, Inc., 310 F. App'x 454, 458 (2d Cir. 2009) (dismissing gender-based complaints where the EEOC charge contained only race-related allegations and made no reference to gender bias, and finding that such claims were not reasonably related and that the EEOC was not on notice of the gender-based complaints); Sicular v. N.Y.C. Dep't of Homeless Servs., No. 09-

24

0981(AKH)(AJP), 2010 WL 423013, at *17-22 (S.D.N.Y. Feb. 4, 2010) (dismissing plaintiff's gender discrimination claims where the administrative charge alleged race, age, and religion discrimination, and there was nothing to put the agency on notice of the gender claims).

The Plaintiff contends that her claims under the ADEA and Title VII should be permitted to go forward because the EEOC would have uncovered evidence of gender and age discrimination if it had conducted an investigation of her charge.  The EEOC, however, did conduct an investigation of the claims and allegations asserted by the Plaintiff based upon "the information and evidence submitted" by the parties and related to the Plaintiff's claims that the Defendant "subjected [her] to disparate treatment based on a perceived disability." Subsequent to their investigation, the EEOC determined that it was "unable to conclude that the information obtained establishes violations of the statutes."  (Pl. Ex. J).

Because the Plaintiff's claims were not exhausted or reasonably related to her disparate treatment claim, this Court lacks jurisdiction over the Plaintiff's claims of gender and age discrimination under Title VII and the ADEA.

The McDonnell Douglas Standard

        All of the Plaintiff's discrimination claims are
analyzed under the burden-shifting framework set forth by the
Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792,
93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  See Woodman v. WWOR-
TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (and cases cited
therein recognizing that the framework established by McDonnell
Douglas for Title VII claims also applies to ADEA claims); Crews
v. Trustees of Columbia Univ. in City of New York, 452 F. Supp.
2d. 504, 521 (2006) (stating that in cases "wherein the
plaintiff asserts that the employer's decision was a pretext for
discrimination, courts use the well known McDonnell Douglas
burden-shifting framework.").

        To establish a prima facie case of discrimination, the
Plaintiff must point to evidence in the record showing that:
(1) she is a member of a protected class; (2) she was qualified
for her position; (3) she as subjected to an adverse employment
action; and (4) the adverse employment action took place under
circumstances giving a rise to an inference of discrimination
based on Plaintiff's membership in the protected class.  See

26

Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 110 (2d Cir.
2010). A plaintiff cannot establish a prima facie case based on
"purely conclusory allegations of discrimination, absent any
concrete particulars." Meiri v. Dacon, 759 F.2d 989, 998 (2d
Cir.1985).

If the Plaintiff meets this burden of production with
respect to the prima facie case, then the burden shifts to the
employer to show that any adverse employment actions were taken
for legitimate, non-discriminatory reasons. St. Mary's Honor
Ctr., 509 U.S. 502, 507, 113 S. Ct. 2742, 125 L. Ed. 2d 407
(1993). Once the defendant produces such evidence, "the
presumption raised by the prima facie case is rebutted, and
drops from the case." Id. At that point, "the governing
standard is simply whether the evidence, taken as a whole, is
sufficient to support a reasonable inference that prohibited
discrimination occurred," James v. N.Y. Racing Ass'n, 233 F.3d
149, 156 (2d Cir. 2000). Once the employer has demonstrated a
legitimate, non-discriminatory reason for its decision, the
burden then shifts back to the plaintiff to present evidence
that the employer's proffered reason is a pretext for an
impermissible motivation. Vivenzio v. City of Syracuse, 611
F.3d 98, 106 (2d Cir. 2010).

27

Even Assuming the Administrative Remedies Were Exhausted, The
Age And Gender Claims Are Dismissed

Plaintiff has alleged that the decision to terminate
her was motivated, at least in part, by age and gender
discrimination.[3]  Here, there is no dispute that the Plaintiff
can establish the first, second and third prongs of a prima
facie case.  However, she has failed to establish that she was
terminated under circumstances that give rise to an inference of
unlawful age or gender discrimination.  To demonstrate that she
was terminated for illegal reasons, the Plaintiff "must do more
than merely proffer [her] own belief that [s]he was
discriminated against." Dawkins v. Witco Corp., 103 F. Supp. 2d
688, 697 (2000).  Moreover, even assuming the Plaintiff makes
her prima facie case, the Defendant has met its burden in
rebutting the Plaintiff's case by offering evidence

---

[3] Discrimination based on age and gender are protected under the following
statutes:

The ADEA protects workers who are "at least 40 years of age" by making it
unlawful for an employer to "fail or refuse to hire or to discharge any
individual or otherwise discriminate against any individual with respect to
his compensation, terms, conditions, or privileges of employment,  because of
such individual's age." 29 U.S.C. §§ 631(a), 623(a)(1).

Title VII states that it "shall be an unlawful employment practice for an
employer . . . to discriminate against any individual with respect to his [or
her] compensation, terms, conditions, or privileges of employment, because of
such individual's race, color, religion, sex, or national origin[.]" 42
U.S.C. § 2000e-2(a)(1).

28

demonstrating the non-discriminatory basis for its decision to discharge the Plaintiff.

As to her age discrimination claim, under the ADEA, an employer may not discharge an employee because of her age, but may discharge an elderly employee for reasonable factors other than age or for good cause.  29 U.S.C. 623(f)(1) and (3).  The employee has the burden of proving that age was a "causative or determinative factor, one that made a difference in deciding whether the plaintiff should be employed."  Geller v. Markham, 635 F. 2d 1027, 1035 (2d Cir. 1980).  The employer is not required to prove that there was a justifiable cause for the employee's discharge, just that there was a legitimate reason for the discharge.  Parcinski v. Outlet Co., 673 F.2d 34, 36 (2d Cir. 1982).

In the context of a Title VII discrimination claim, a plaintiff must allege facts "sufficient to plausibly suggest [a defendant's] discriminatory state of mind" and conclusory allegations are not entitled to the presumption of truth. Ashcroft v. Iqbal, 556 U.S. 662, 677-81, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); see also Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (affirming dismissal of the plaintiff's Title VII

29

claims because "she failed to plead any facts that would create an inference that any [adverse] action taken by . . . [any] defendant was based upon her gender.") (bracketed text in original). "The sine qua non of a gender-based discrimination action claim . . . is that the discrimination must be because of sex." Id. at 111.

To support her claims of discrimination, the Plaintiff relies on the act that she was terminated and that she was 56 years old and female. These facts, standing alone, particularly in the context of a group-termination RIF, cannot support her discrimination claims. See, e.g., Sgarlata v. Viacom, Inc., Nos. 02-7234(RCC) and 03-5228(RCC), 2005 WL 659198, at *7 (S.D.N.Y. Mar. 21, 2005) (granting employer summary judgment where plaintiff was terminated as part of a department-wide RIF and his job duties were absorbed by those co-workers that remained, where plaintiff only offered his own belief that he was discriminated against); Pisana v. Merrill Lynch & Co., No. 93-4541(LMM), 1995 WL 438715, at *3-5 (S.D.N.Y. July 24, 1995) (recognizing that courts place a greater burden on plaintiffs terminated as part of a reduction-in-force to prove an intent to discriminate).

It is uncontested that, due to the Defendant's economic circumstances in 2008, both attorney work hours and gross revenue had been reduced, the latter by 20 percent. As early as 2005, the firm recognized the uncertainty facing the secretarial staff. Alcott has testified that she had spared her department from outsourcing for at least two years prior to 2005. By 2006, the Defendant began its review of the administrative resources and staffing requirements in the firm's New York and Washington D.C. offices.

In 2008, Alcott, as Director of Secretarial Services, was given the task to prepare and execute the RIF, in order to reduce the firm's expenses. Alcott alone determined which individuals were selected for layoff within the New York office's Secretarial Services department. She has testified that she decided to eliminate the Evening Secretarial Supervisor position held by the Plaintiff, because the responsibilities associated with the position had drastically decreased over the years and as such the position could be absorbed by the Plaintiff's supervisor, Hudson. The record has shown that in 1998, when the Plaintiff first became the Evening Secretarial Supervisor, she was responsible for coordinating staffing for 30 to 40 attorney requests for evening secretarial staffing each

31

night.  Over the years, as attorney work habits changed and
attorneys became more computer literate, the number of evening
secretarial desk assignments requested by attorneys dwindled to
only two or three assignments per night.  Given this 95 percent
reduction in the number of evening secretarial assignments,
there was considerably less to do in assigning and coordinating
their work.  In addition, after the Plaintiff's termination, the
Evening Secretarial Supervisor position has remained and Hudson
has absorbed the Plaintiff's few remaining job responsibilities.

Here, not only were staff reductions in effect to
reduce the Defendant's expenses, but none of the other
supervisors on the Evening Shift were terminated.  At the time
of the August 2008 RIF, both Hudson and Rosario were older than
the age of 40, in fact both are older than,[4] and of the same
gender, as the Plaintiff.  Therefore the retained supervisory
employees were within the same protected classes as the
Plaintiff.  Under these circumstances, no inference of age or
gender discrimination can be drawn.  See, e.g., Bay v. Times
Mirror Magazines, Inc., 936 F.2d 112, 118 (2d Cir. 1991)
(finding that the retention of three older employees relevant to
the Plaintiff's ADEA claim); see also Pisana, 1995 WL 438715, at

---

[4] Hudson was 65 years old and Rosario was 57 years old in August 2008.

*4 (noting that "several of the retained individuals were older than [plaintiff]", and that such "fact alone strongly suggests that the RIF was not pretextual for age discrimination.").

In addition, Alcott, the sole decision-maker with respect to the RIF, is herself female and was 54 years old at the time of the RIF, which also precludes an inference of age or gender discrimination. See e.g., Id. at *5 (noting that the "fact that these decision makers were close to [the Plaintiff's age, or older, weakens any suggestion of age discrimination.); Williams v. Brooklyn Union Gas Co., 819 F. Supp. 214, 225 (E.D.N.Y. 1993) (dismissing federal and state age discrimination claims where the employees responsible for the plaintiff's termination were older than plaintiff or approximately the same age). No evidence has been presented that Alcott harbored any animus towards the Plaintiff regarding her age or gender.

Plaintiff's statistical analysis, standing alone, is also not sufficient to defeat summary judgment. Although a generalized statistical analysis of selections in a RIF can provide circumstantial evidence of an inference of discrimination in support of a prima facie case, as a matter of law, it is not sufficient to establish that the Defendant's

33

legitimate business rationale for eliminating Plaintiff's position is false, or that her age or gender was the real reason for her termination. See Robinson v. Metro-North Commuter R.R., No. 94-7374(JSR), 1998 WL 17742, at *9 (S.D.N.Y. Jan. 16, 1998) (holding that "while statistical evidence may sometimes enable a plaintiff to carry its modest burden of creating a prima facie case . . . the Court is aware of no case where generalized statistical evidence has been held sufficient to refute, for summary judgment purposes, a defendant's particularized evidentiary showing of a non-discriminatory explanation for a particular act complained of") (internal citation omitted); see also Weinstock v. Columbia Univ., 224 F.3d 33, 46 (2d Cir. 2000) (affirming summary judgment for a university and finding that statistical evidence purporting to show under-representation of women in faculty "is little but an unsupported hypothesis providing no foundation for the assertion that there was discrimination in [plaintiff's] tenure process"); Hudson v. Int'l Business Machines Corp., 620 F.2d 351, 355 (2d Cir. 1980) (where the plaintiff "has failed to establish his case . . . the statistics standing alone do not create it.").

The Plaintiff's statistical analysis is also flawed as it includes employees from the Defendant's Washington, D.C.

34

office, none of whom was selected by the same decision-maker who selected the Plaintiff.  In addition, the analysis arbitrarily excluded a large number of people within the protected category (those age 40-49), apparently upon recognizing that this older group of employees had been selected for termination at a lower rate than those outside the protected category (those under age 40).  The Plaintiff's expert's subsequent analysis analyzed the effect of age only on employees who are age 50 or over, and groups those who are within the protected age category (age 40-49) with those who are not within the protected group (39 and under).  The results were also altered by controlling irrelevant factors such as race and years of service, even though the Plaintiff does not assert claims of race or seniority discrimination.  Doing the same analysis without these inappropriate control facts shows that there is no correlation between age and selection for the RIF.

Moreover, the Plaintiff cannot establish pretext by disagreeing with the Defendant's assessment of its business and the effect of economic conditions.  See Parcinski, 673 F.3d at 37 (finding that the ADEA "does not authorize the courts to judge the wisdom of a corporation's business decisions."); Drown v. Portsmouth Sch. Dist., 435 F.2d 1182, 1186 (1st Cir. 1970)

35

(stating that employers have the "prerogative to be shortsighted
and narrowminded."); Kawalkowski-Kojac v. Otto Oldsmobile-
Cadillac, Inc., No. 06-1527(GLS/DRH), 2009 WL 667427, at * 4
(N.D.N.Y. Mar. 10, 2009) (refusing to find pretext because the
court is not a "business manager that counsels entities as to
how to run a business," an employer's restructuring process is a
business decision to be made by the employer.).


        Plaintiff's complaints about the lack of "formal" RIF
plans and Alcott's role as the sole decision-maker for the
terminations in the New York Secretarial Services department are
no more than disagreements with Defendant's process for planning
the RIF and provide no evidence of discriminatory intent or
pretext.  See O'Sullivan v. N.Y. Times, 37 F. Supp. 2d 307, 317-
19 (S.D.N.Y. 1999) (refusing to substitute its business judgment
for that of the employer where, in a RIF, plaintiffs tried to
demonstrate pretext by disagreeing with decision-making process
used).  Here, the Defendant made the business decision to
entrust Alcott, who had been employed by the firm for 37 years
and held the position of Director of Secretarial Services since
1992, to coordinate and execute the RFI.  She was instructed to
report into, receive counsel from and provide Human Resources
with her final list of terminated employees.  Unfortunately,

"[t]he essence of a RIF is that competent employees who in more prosperous times would continue and flourish with a company may nevertheless have to be fired." Donaldson v. Merrill Lynch & Co., 794 F. Supp. 498, 504 n.3 (S.D.N.Y. 1992).

The only document used by Alcott during the RIF planning process contains information about employee demographics and, according to Zito, had "age-related" notations. Alcott testified that age was not a consideration and that the document was created by Human Resources after Alcott made her first selection of individuals to be discharged without regard to age. The Plaintiff's name was handwritten onto the list by Alcott after the chart was created by Human Resources, and there is no demographic data (age or otherwise) provided for the Plaintiff. Alcott testified that she had no knowledge of the meaning of the notations in her hand, "57 40+ 43 under" and "2.4 over 1.8 under". It could well be assumed that these notations have a financial connotation, but the record is silent as to their significance. The Defendant's speculation does not constitute evidence nor create inference.

In considering the same document, the Honorable Deborah A. Batts stated that "the cryptic notations, none of

37

which corresponds in any obvious way to the ages of the
secretaries selected for termination, the ages of the
secretarial staff as a whole, or the ratio of that portion of
either population which was over 40 years old to that which was
younger than 40 years old . . . is thus of little evidentiary
value in showing that Alcott considered employees' ages . . .
and the document is not a 'smoking gun' giving rise to an
inference of discrimination." Cuttler v. Fried, Frank, Harris,
Shriver and Jacobson, 2012 WL 1003511, at *6 (S.D.N.Y. March 23,
2012).

In support for her claim for gender discrimination,
the Plaintiff argues that she has made a prima facie case
because she, along with the other older, female floater
secretaries, was terminated, whereas no male employee was
negatively affected. (Pl. Opp. Memo at 21). More specifically,
the Plaintiff contends that "no male daytime secretary,
nighttime secretary, word processor, or supervisor was
terminated pursuant to the August 2008 RIF." (Id.). The
Plaintiff's allegations are speculative, cited to and based on
her own testimony, and do not provide any evidence that the
elimination of her position in the RIF was a pretext of gender
discrimination. Similar to the record presented by Judith

38

Cuttler ("Cuttler"), here the Plaintiff has not "identified a single similarly-situated male employee who was not terminated, and indeed the record shows that there were no male floater secretaries at the Firm at the time of the RIF or for some time prior to the RIF." Cuttler, 2012 WL 1003511, at *5.

The Plaintiff has noted that at least three male secretaries were reclassified so as not to be negatively affected by the RIF and that younger individuals were reshuffled into "safe jobs" while older individuals were placed into floater positions that was eliminated in the RIF. Whatever the implication for the reclassification or reshuffling, economic or otherwise, is not relevant to the termination of the Evening Secretarial Supervisor position.

Similarly, the Defendant's promotion of five lawyers to partner that year also does not establish pretext. There is no evidence to establish a relationship between the promotions and the decrease in workload of the secretarial staff and the effort to reduce administrative costs. No attorneys were laid off in the August 2008 RIF.

39

Reference to other claims asserted against the Defendant are unproven allegations and do not establish pretext for age or gender discrimination.  The Plaintiff urges that these allegations "present relevant evidence as to a pattern and practice of the firm's discriminatory animus, and they tend to support a claim of pretext.  (Pl. Opp. Memo at 19).  However, the litigations referenced and cited to by the Plaintiff include a claim of national origin and race discrimination, a claim of gender discrimination by an attorney, and a complaint of ageist comments made by the Defendant's Director of European Marketing in December 2006.  These administrative and court filings do not imply discriminatory intent on the part of Alcott as to the Plaintiff.

Similarly, affidavits from co-workers, "either individually or collectively, fail to provide the necessary evidentiary support."  Lee v. HealthFirst, Inc., No. 04-8787(THK), 2007 WL 634445, at *17 (S.D.N.Y. Mar. 1, 2007) (refusing to consider affidavits of plaintiff's co-workers because they consisted of "conclusory allegations," and evidence submitted in opposition to a summary judgment motion must be based on "concrete particulars").  The declaration of Rosemary Tammaro ("Tammaro"), who retired before the RIF, references an

irrelevant complaint she filed in 1995 concerning "personal
insulting remarks" by her supervisor.  (Tammaro Decl. 6-7)
Doreen Minogue ("Minogue"), who complains that she was
discharged during the August 2008 RIF while on a leave of
absence, was in fact replaced before the layoff by Kathleen
Filandro ("Filandro"), who had been a floater secretary and who
was the same age as Minogue.  (Minogue Decl. 12-17; Alcott/
Cutler Tr. 74:22- 77:5).  The declaration of Cuttler recited her
allegations in support of her own pending claim of
discriminatory discharge in the August 2008 RIF, claims which
have been dismissed in a decision by the Honorable Deborah A.
Batts.  Cuttler, 2012 WL 1003511, at *10.  Affidavits from
former employees alleging that they were discharged because of
their age is insufficient to demonstrate pretext because an
"employee's subjective [beliefs or] personal disappointments do
not meet the objective indicia of an averse employment action."
Kawalkowski-Kojac, 2009 WL 667427, at *5 (internal citations
omitted) (bracketed text in original).

     For the reasons stated above, the evidence fails to
establish a prima facie claim of age or gender discrimination by
the Plaintiff.

A Claim Of Failure To Promote Because Of Age Or Disability Has
Not Been Established

      To establish a prima facie case, a plaintiff claiming
a failure to promote must show "she applied for an available
position for which she was qualified, but was rejected under
circumstances which give rise to an inference of unlawful
discrimination." Brown v. Coach Stores, 163 F.3d 706, 710 (2d
Cir. 1998) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450
U.S. 248, 253, 101 S. Ct. 1089, 67 L.Ed. 2d 207 (1981)).

      The Plaintiff's claim that she was denied a promotion
to Hudson's position based on her age and disability has not
been established.  First, the Plaintiff has not demonstrated
that she sought a promotion to an available position.  Hudson's
position was not available until her retirement in April 2009.
The position became vacant nearly eight months after Plaintiff's
discharge.  See Brown, 163 F.3d at 710; Kamrowski v. Morrison
Mgmt. Specialist, No. 05-9234(KMK), 2010 WL 3932354, at *12
(S.D.N.Y. Sept. 29, 2010) (dismissing plaintiff's failure to
promote claim because the only position sought by the plaintiff
was not vacant).

The Plaintiff's desire for a promotion to Hudson's
position upon retirement and the several inquiries over the
years made about her role after Hudson's retirement are
insufficient to establish a failure to promote claim.  See
Petrosino v. Bell Atl., 385 F.3d 210, 227 (2d Cir. 2004)
(stating that it is well settled that a prima facie case cannot
be established merely with evidence that "a plaintiff generally
requested promotion consideration.").  There is no indication or
inference of unlawful discrimination here, as Hudson was nine
years older than the Plaintiff and the only incident relating to
the Plaintiff's alcoholism occurred more than fifteen years
prior to her discharge.

In addition, once Hudson retired, the position
remained unfilled, as Hudson's job duties were absorbed by
Rosario and Alcott.  The Plaintiff relies on Mauro v. S. New
Eng. Telecomms, Inc., 208 F.3d 384 (2d Cir. 2000), to support
her contention that Hudson's position need not be open or
available for her claim to survive.  In that case, however, the
positions at issue were actually open but the plaintiff was
unaware of the specific available positions because the employer
never posted them.  Id. at 387 (stating that "[i]n such a
situation, requiring the plaintiff to show that he or she

43

applied for the specific jobs at issue would be unrealistic, as an employee by definition cannot apply for a job that he or she does not know exists.).  Moreover, granting summary judgment on a failure to promote claim is proper when the position has been eliminated.  Blake v. Bronx Leb. Hosp. Ctr., No. 02-3827(DAB), 2007 WL 2981465, at *8 (S.D.N.Y. Oct. 10, 2007) (noting that when "no applicants are sought, no failure to promote claim exists.").

Accordingly, Plaintiff's failure to promote claim has not been established.

Retaliation Has Not Been Established and the Disability Claim is Dismissed

Plaintiff alleges that she was terminated in retaliation for taking FMLA leave approximately three months prior to her termination.  To make out a prima facie case of retaliation under the FMLA, a plaintiff must prove that:  (1) she exercised rights protected under the FMLA; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of retaliatory intent or that there was a causal connection between the protected activity and the

44

adverse action.  DiGiovanna v. Beth Isr. Med. Ctr., 651 F. Supp. 2d 193, 204 (S.D.N.Y. 2009) (citing Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004)).

Plaintiff meets the first three elements of the prima facie case of retaliation under the FMLA.  She was on leave from April 28, 2008 until June 2, 2008, she was qualified for her position as the Evening Secretarial Supervisor, and she was terminated from her employment.  The Plaintiff, however, fails to prove that the circumstances surrounding her termination at Fried Frank support an inference of retaliatory intent or that there was a causal link between the protected activity and her termination.  See Galdieri-Ambrosino v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).  The evidence is uncontroverted that the Plaintiff was terminated when her position was eliminated as part of the firm's August 2008 RIF. She has not presented any evidence to suggest that her taking a leave was a factor in that decision.  Moreover, Rosario, the Evening Word Processing Supervisor, was also on a leave of absence during that period and was not discharged.

The Plaintiff also alleges that her leave of absence for her foot injury was misconstrued as a relapse with

45

alcoholism and that she was terminated in retaliation for complaining about being perceived as having relapsed from her sobriety.  The Plaintiff, however, has failed to prove the fourth element of her prima facie case for discrimination in violation of the ADA.

When evaluating discriminatory discharge claims in violation of the ADA,[5] the court applies the McDonnell Douglas burden-shifting framework.  To establish a prima facie case of discrimination under the ADA, "[a] plaintiff must show by a preponderance of the evidence that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  Heyman v. Queens Vill. Comm. for Mental Health, 198 F.3d 68, 72 (2d Cir. 1999) (citing Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998)).  In addition, summary judgment is appropriate "where a plaintiff fails to identify a facially reasonable accommodation that the defendant

---

[5] The ADA prohibits discrimination by an employer covered by the ADA against a "qualified individual with a disability because of the disability of such individual in regard to ... [the] discharge of employees[.]" 42 U.S.C. § 12112(a).

46

refused to provide." Cuttler, 2012 WL 1003511, at *10 (citing Kennedy v. Dresser Rand Co., 193 F.3d 120, 122 (2d Cir 1999)).

Plaintiff has stated that she never complained to anyone that she believed that she was perceived as disabled and relapsing from her sobriety.  There is no evidence, other than the Plaintiff's speculation, that the Defendant believed that her foot injury related to her alcoholism over fifteen years earlier.  Indeed, in the fifteen years since the Defendant became aware of the Plaintiff's alcoholism in May 1993 and Plaintiff underwent recovery and rehabilitation with the Defendant's support, no evidence of incidents at work relating to Plaintiff's alcoholism have been presented.  In fact, Plaintiff was promoted to the Evening Secretarial Supervisor position in 1998, five years after the incident with alcohol.

Plaintiff has offered only her own conclusory allegations and speculation in an attempt to support her allegations of pretext, alleging that:  (1) calls made by Alcott and Defendant's Benefits Manager to her during her leave of absence concerning required disability forms "sounded suspicious" and (2) subordinate employees made two comments

47

after her return from leave of absence relating to her alleged alcoholism.

With respect to the calls made by Alcott and Frobuccino during the Plaintiff's leave of absence, the Plaintiff has acknowledged that the calls related to her failure to provide required disability forms in a timely manner. The calls were related to a concern that the Plaintiff would not be able to receive her salary continuation benefits.

Plaintiff has also fails to establish either an inference of discrimination or pretext by relying on two comments allegedly made by two subordinate employees in July 2008, which she claims references her alcoholism. Plaintiff has alleged that Kawalek made the comment that the Plaintiff was "drunk with power", and that Paroline commented "I feel like I'm at an AA meeting."

Such comments were stray, isolated remarks uttered by the Plaintiff's subordinates, who were not decision-makers and were not connected to the decision to eliminate her position and terminate her employment during the RIF. See Monte v. Ernst & Young LLP, 330 F. Supp. 2d 350, 363-64 (S.D.N.Y. 2004) (finding

48

that "a few vague and isolated remarks" were insufficient to
establish discriminatory animus), aff'd, 148 F. App'x 43 (2d
Cir. 2005); Campbell v. Alliance Nat'l Inc., 107 F. Supp. 2d
234, 247 (S.D.N.Y. 2000) (granting summary judgment and finding
that "isolated and stray" comments made by non-decision makers
is insufficient to establish discrimination); Ezold v. Wolf,
Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3rd Cir. 1992)
(stating that "[s]tray remarks by non-decision makers or by
decision-makers unrelated to the decision process are rarely
given weight.").

    Moreover, even as alleged, the comments themselves are
not properly interpreted as referencing the Plaintiff's alleged
disability relating to alcoholism.  The comment by Kawalek was
made in the context of Kawalek's complaint to Alcott and Human
Resources that the Plaintiff was "abusing her authority over
[Kawalek]" and that Plaintiff was being "overbearing to
[Kawalek]."  The phrase has been used to reference the type of
behavior Kawalek was complaining about, and has nothing to do
with being an alcoholic.  In addition, Paroline's comment was
made in the context of an annual performance review meeting, in
response to a request that Paroline provide a "Self-Appraisal

49

Form" and has no connection with Plaintiff's disability or recovering alcoholism.

In her Complaint, Plaintiff alleges that Defendant retaliated against her by terminating her employment for "complaining about being perceived as having relapsed from her sobriety." Plaintiff has also contends that because she took FMLA leave she was subjected to retaliatory conduct in the form of multiple phone calls during her leave and was "harassed and humiliated" by two employees under supervision after her return from leave. However, the Plaintiff has put forth no evidence of a causal link between these alleged disputes and any purported protected activity. As discussed above, there is nothing other than the Plaintiff's speculation that her termination had anything to do with her alcoholism fifteen years prior.

The State and Local Law Claims Fail For the Same Reasons As Her Federal Claims

As discussed above, each of the Plaintiff's federal claims fails. The Plaintiff's New York State and City Human Rights Laws claims are pendant to her federal claims. Under 28 U.S.C. 1367(a)(c), a Court has the discretion to exercise supplemental jurisdiction over pendant state law claims. If,

50

however, "the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Purgess v. Sharrock, 33 F.3d 134, 138 (2d. Cir. 1994).

The sufficiency of the disputed facts to require a hearing of the discrimination claims apply equally to the claims under the NYSHRL and NYCHRL and requires denial of the motion for summary judgment as to the NYSHRL and NYCHRL claims as well. See Kemp v. Metro-North R.R., 316 Fed App'x 25 (2d. Cir. 2009) (stating that analysis of NYSHRL claims are governed by the same standards as those that apply in federal civil rights cases); Boyle v. HSBC Bank, USA, Inc., No. 08-11358, 2010 WL 235001, at *4 n.53 (S.D.N.Y. Jan. 19, 2010) ("Age discrimination claims under the NYSHRL and the NYCHRL are analyzed under the same framework as the ADEA."). Accordingly, the Plaintiff's state and local law claims are dismissed.

## V. Conclusion

Upon the facts and conclusions set forth above, the motion of the Defendant is granted, and the Complaint of the Plaintiff will be dismissed with prejudice and costs.

51

It is so ordered.

New York, NY
June /3, 2012

ROBERT W. SWEET
U.S.D.J.